Colin Cox (TX Bar No. 24101653)
Center for Biological Diversity
1025 ½ Lomas NW
Albuquerque, NM 87102
Phone: (832) 316-0580
ccox@biologicaldiversity.org

Tala DiBenedetto (NY Bar No. 5836994)*
Center for Biological Diversity
P.O. Box 371
Oceanside, NY 11572-0371
Phone: (718) 874-6734, ext. 555
tdibenedetto@biologicaldiversity.org

Andrea Zaccardi (Idaho Bar No. 8818)*
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Phone: (303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiff*
*Seeking admission *pro hac vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**; | ) ) ) |  |
| Plaintiff, | ) ) | Case No. 5:25-cv-179 |
| v. | ) ) ) | **COMPLAINT FOR DECLARATORY** |
| **USDA APHIS WILDLIFE SERVICES**; **JESSICA FANTINATO**, in her official capacity as Deputy Administrator, USDA APHIS Wildlife Services; **BROOKE L. ROLLINS**, in her official capacity as Secretary of Agriculture; **MICHAEL J. BODENCHUK**, in his official capacity as State Director of Texas Wildlife Services. | ) ) ) ) ) ) ) ) ) | **AND INJUNCTIVE RELIEF** |
| Defendants. | ) |  |

## INTRODUCTION

1.     Plaintiff Center for Biological Diversity ("Center") brings this lawsuit against Defendants U.S. Department of Agriculture ("USDA") Animal and Plant Health Inspections Service ("APHIS") Wildlife Services; Jessica Fantinato, in her official capacity as the program's Deputy Administrator; Brooke L. Rollins, in her official capacity as the U.S. Secretary of Agriculture; and Michael J. Bodenchuk, in his official capacity as the Director of Texas Wildlife Services (hereinafter collectively "Wildlife Services"). Wildlife Services, through its "Predator Damage Management" programs, continues to kill wildlife across southern and western Texas in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, the agency's implementing regulations, 7 C.F.R. § 372.1–372.10, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

2.     Wildlife Services has never prepared an Environmental Impact Statement ("EIS") to analyze the significant, statewide impacts of its wildlife killing activities in Texas. Instead, various districts rely on outdated "environmental assessments" that fail to take a hard look at impacts and must be supplemented with new information relevant to the predator killing programs. While an updated environmental assessment was prepared for Texas' Canyon District in 2023, other districts across the state – including Fort Stockton, Uvalde, and Corpus Christi – continue to rely on outdated and faulty environmental assessments up to a decade old. Wildlife Services' Fort Stockton, Uvalde, and Corpus Christi Districts include a collective forty-six counties across western and southern Texas.

3.     These outdated environmental assessments provide inadequate analyses of the harms to mountain lions and state-listed black bears from Wildlife Services' predator killing programs. Wildlife Services continues to kill mountain lions in the state using inhumane and

indiscriminate methods like strangulation snares despite new data documenting threats to the state's mountain lion populations and state-threatened black bears, such as documented black bears mortalities from traps set for mountain lions, as well as new studies questioning the efficacy of predator killing programs.

4.      Through this Complaint, Plaintiff seeks a declaration that Wildlife Services' ongoing authorization and implementation of the Predator Damage Management programs in Texas' Fort Stockton, Uvalde, and Corpus Christi Districts violates federal law. Plaintiff additionally seeks to compel compliance with NEPA, and additional injunctive relief to redress the injuries caused by these violations. Should Plaintiff prevail, it will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706(1).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the agency's violations of law occurred and continue to occur in this district. The Texas Wildlife Services state office, where decision-making regarding Texas Wildlife Services activities is made, is located in this district. Accordingly, injury to Plaintiff and its members occurred and continues to occur in this district.

## PARTIES

7.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) organization with more than 79,000 active members, including more than 3,000 in Texas. The Center maintains offices in Tucson, Arizona and elsewhere across the country. The Center works

through science, law, and media to protect rare wildlife, including predators targeted by Wildlife Services.

8.    Plaintiff and its members are committed to ensuring that Wildlife Services complies with all applicable federal laws. Wildlife Services' Predator Damage Management programs in Texas adversely impact Plaintiff's interests in the Texas wildlife that Wildlife Services could injure or kill – intentionally or unintentionally – including coyotes, mountain lions, black bears, bobcats, foxes, raccoons, and other wildlife. Plaintiff also has members who are adversely impacted by the threat that Wildlife Services' use of indiscriminate traps and poisons poses to companion animals in Texas.

9.    Laiken Jordahl currently serves as Southwest Conservation Advocate for Plaintiff and has been a Center member since 2017. Mr. Jordahl possesses a strong passion for wildlife, ecosystems, and public lands. Throughout his career, he has fought to protect them in the Southwest and U.S.-Mexico borderlands.

10.    Mr. Jordahl has regularly traveled to southern Texas to areas like Starr County – located in Texas's Corpus Christi District and home to Texas' southern resident mountain lion population – to observe areas and wildlife impacted by border wall construction and engage in other activities. He has concrete plans to return by the end of summer 2025.

11.    Prior to joining the Center, Mr. Jordahl served as a National Park Service Wilderness Fellow, where he worked with stakeholders to monitor conditions in five national parks and monuments, including Big Bend National Park in Texas's Fort Stockton District. Mr. Jordahl regularly observed black bears in and around the park during his time there and would often venture out in the hopes of seeing black bears and mountain lions. He plans to return to the area with his family to recreate in and near Big Bend National Park. However, Wildlife Services'

predator killing activities make it less likely for Mr. Jordahl to observe certain wildlife – including mountain lions and black bears – in the area, significantly depreciating his enjoyment of these places.

12.    Mr. Jordahl derives significant aesthetic, recreational, professional, and spiritual enjoyment from viewing wildlife in areas affected by Wildlife Services' activities. Wildlife Services' killing of large carnivores, especially where these animals are under other stressors, adversely affects, and will continue to adversely affect, Mr. Jordahl's interests in viewing these animals. He has observed that sightings of large carnivores have become increasingly rare in areas he visits at the borderlands in South Texas.

13.    Center member and Texas resident Marshall Carter-Tripp is a retired diplomat and political scientist. In her Foreign Service work, she represented U.S. agencies on environmental, science, and technology issues. Dr. Carter-Tripp lives in El Paso, located in Texas' Fort Stockton District. She cares deeply about the local environment, including wildlife and native plants. Dr. Carter-Tripp has enjoyed traveling in Texas to view wildlife, such as mountain lions and black bears. One area of importance to her is Big Bend, where she can be out near wildlife and their habitats. She plans to return by the end of this year. Dr. Carter-Tripp derives significant spiritual and aesthetic enjoyment from the presence of wildlife in and near where she lives, and along the Rio Grande to Big Bend. She believes that more needs to be done to protect wildlife, including predators in Texas, and that Wildlife Services' killing of mountain lions and the impacts of Wildlife Service's predator killing activities on both mountain lion and black bear populations in the state adversely affect her opportunities to enjoy these animals. Wildlife Services' predator killing activities harm her interests by making it much less likely for her to observe wildlife in the

region where she lives and during her travels. She is particularly saddened by the decline in mountain lion sightings she has observed in her area in the past decade.

14.    Accordingly, Mr. Jordahl's and Dr. Carter-Tripp's interest have been, and will continue to be, injured by Wildlife Services' predator killing activities in western and southern Texas, and its failure to comply with NEPA in implementing its Predator Damage Management Program.

15.    Plaintiff's members live and recreate in or near areas in Texas where implementation of Wildlife Services' Predator Damage Management programs occurs, for the purposes of hiking, observing wildlife, and other recreational and professional pursuits. Plaintiff's members enjoy observing, attempting to observe, photographing, and studying wildlife, including signs of the above-mentioned species' presence in these areas. The opportunity to view wildlife or signs of wildlife in these areas is of significant interest and value to Plaintiff's members and staff, and increases the use and enjoyment of public lands and ecosystems in Texas. Plaintiff's members also have an interest in the health and humane treatment of animals, including wildlife that may have been harmed by Wildlife Services' Predator Damage Management programs. Plaintiff's members, staff, and supporters have engaged in these activities in the past and intend to do so again in the near future.

16.    Plaintiff's members, including Mr. Jordahl and Dr. Carter-Tripp, also suffer procedural injury from the failure of Wildlife Services to comply with NEPA. Wildlife Services' failure to comply with its NEPA obligations significantly increases the risk that the agency will continue to engage in lethal and inhumane methods of wildlife damage management without being adequately informed as to adverse impacts. If Wildlife Services were to engage in supplemental NEPA analysis, the Center would, on behalf of its members, fully participate in the NEPA process.

The Center has worked to reform Wildlife Services throughout the United States, including in Texas, and has participated in the public processes NEPA requires for the Predator Damage Management program. For example, Plaintiff raised concerns about impacts to mountain lions from Wildlife Services' predator killing activities through public comments on the 2014 environmental assessment for Texas' Canyon District. Plaintiff and its members, staff and supporters have an interest in preventing Wildlife Services from using lethal and inhumane methods of wildlife damage management on ecologically significant native species at risk of population decline or local extirpation in Texas. The relief requested in this litigation would further that goal.

17.     The interests of Plaintiff's members, staff, and supporters have been, and will continue to be, injured by Wildlife Services' implementation of its Predator Damage Management programs in Texas and by Wildlife Services' failure to comply with NEPA and the APA.

18.     The relief Plaintiff seeks in this Complaint would redress the injuries of Plaintiff's members, staff, and supporters. The relief Plaintiff requests, if granted, would ensure that Wildlife Services engages in further NEPA review and would prevent Wildlife Services from engaging in wildlife killing as part of its Predator Damage Management programs in Texas unless and until it complies with federal law. Requiring Wildlife Services to update its environmental analyses to reflect recent studies and updated scientific information will improve decision-making and mitigate harm to mountain lions and state-listed black bears from the agency's wildlife killing activities. Plaintiff's requested relief, if granted, could have long-term impacts on reducing the amount of lethal predator control using cyanide bombs and other wildlife killing conducted in Texas, as well as the inhumane treatment of wildlife and other injuries. It would also make wildlife killing more expensive for the Texas Wildlife Damage Management Association, local

municipalities, and private livestock producers because these entities would not be able to contract with Wildlife Services to kill wildlife on their behalf unless and until Wildlife Services complied with federal law. These entities could not and would not be able to completely replace Wildlife Services' Predator Damage Management programs authorized through eight districtwide decision documents, and they would not be able to provide the services at the same cost as Wildlife Services. These entities do not have the equipment that Wildlife Services has, such as fixed-wing aircrafts for aerial gunning operations, or trained wildlife killing personnel.

19.     Plaintiff's interests, and the interests of its members and supporters, have been, are being, and will continue to be harmed by Wildlife Services' actions and inactions challenged in this complaint unless the Court grants the requested relief. The harm to Plaintiff's interests, and to its members and supporters' interests, will be redressed if this Court issues the requested relief.

20.     Defendant USDA APHIS WILDLIFE SERVICES is a federal program responsible for applying and implementing the federal laws and regulations challenged in this Complaint. Wildlife Services receives funding from the federal government and state-based cooperators to undertake its Predator Damage Management programs in Texas.

21.     Defendant JESSICA FANTINATO is being sued in her official capacity as the Deputy Administrator of USDA APHIS Wildlife Services.

22.     Defendant BROOKE L. ROLLINS is being sued in her official capacity as Secretary of the United States Department of Agriculture.

23.     Defendant MICHAEL J. BODENCHUK is being sued in his official capacity as Director of Texas Wildlife Services.

## LEGAL BACKGROUND

**I.      National Environmental Policy Act**

24.      NEPA lays out "a national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. It requires agencies to evaluate and publicly disclose the potential environmental impacts of proposed actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

25.      NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also id.* § 4336e(10) (defining "major federal action").

26.      To determine whether an action is significant – i.e., whether an EIS is necessary for the proposed action – USDA APHIS's regulations provide for the preparation of an environmental assessment. The regulations further clarify that actions normally requiring preparation of an environmental assessment include "[p]rograms or statewide activities to reduce damage or harm by a specific wildlife species or group of species … or to reduce a specific type of damage or harm, such as protection of agriculture from wildlife depredation." 7 C.F.R. § 372.5(b)(5).

27.      When conducting environmental analyses pursuant to an environmental assessment or EIS, an agency must consider alternatives to the proposed action. 42 U.S.C. § 4332(C)(iii); 7 C.F.R. § 372.8(e). Additionally, the agency is required to implement mitigation and other conditions established in an environmental assessment or EIS "committed to as part of the decisionmaking process." 7 C.F.R. § 372.8(f).

28.      NEPA requires "that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *Marsh*, 490 U.S. at 374. An agency therefore has a continuing obligation to comply with NEPA in connection with ongoing

agency actions. It is "incongruous" with "the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Id.* at 371; *see also Robinson v. United States (In re Katrina Canal Breaches Litig.)*, 696 F.3d 436, 450 (5th Cir. 2012). Preparation of post-decision supplemental NEPA analysis documents satisfies the Act's "action-forcing" purpose. *Marsh*, 490 U.S. at 370–71 (citing 42 U.S.C. § 4321).

29.     Once the decision to prepare a supplemental NEPA analysis document is made, APHIS must publish its notice of intent. 7 C.F.R. § 372.9.

**II.     Administrative Procedure Act**

30.     The Administrative Procedure Act ("APA") governs judicial review. APA section 706(1) authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

**I.     Wildlife Services' Wildlife Killing Program**

31.     Specializing in the killing of wildlife, Wildlife Services and its precursors are largely responsible for the eradication of wildlife like wolves, bears, and other animals from much of the United States. Wildlife Services contracts with other federal agencies, non-federal government agencies, and private landowners to fulfill its mission of resolving "wildlife conflicts."

32.     At present, Wildlife Services kills hundreds of thousands of native animals every year in the U.S. In 2023, Wildlife Services reported killing 375,045 native animals. It intentionally killed 305 gray wolves, 68,562 coyotes, 430 black bears, 235 mountain lions, 469 bobcats, 2,122 red and gray foxes, and 24,603 beavers.

33.     Each year, Wildlife Services unintentionally kills thousands of non-target animals. These non-target animals include federally- or state-protected wildlife such as gray wolves, Mexican wolves, bobcats, and grizzly bears, as well as eagles, falcons, red-tailed hawks, great horned owls, porcupines, marmots, great blue herons, ruddy ducks, sandhill cranes, and ringtail cats. These killings undermine efforts to conserve and recover the affected species, which often need protection in part due to Wildlife Services' historic and ongoing practices. In 2023, the program unintentionally killed at least 2,484 animals, including several dogs and cats.

34.     Former employees of Wildlife Services have alleged that the agency underreports the numbers of animals it kills and, therefore, that the actual numbers of animals killed by Wildlife Services are likely greater than reported.

35.     As explained below, many of the species that Wildlife Services targets play critical roles in ecosystems. The loss of top predators in particular is known to have a wide range of often profound impacts on ecosystems, altering processes as diverse as the dynamics of disease, wildfire, river erosion, carbon sequestration, invasive species, and biogeochemical cycles. In short, the removal of so many animals from the environment – especially predators – significantly alters native ecosystems.

36.     Many of the methods Wildlife Services uses – including M-44 cyanide capsules (also known as "cyanide bombs"), snares, leg-hold and body-gripping traps, and gas cartridges – are fundamentally nonselective, environmentally destructive, and inherently inhumane. These methods are often ineffective at accomplishing the goal of "managing problems caused by wildlife." In Texas alone, in 2023, Wildlife Services intentionally killed 2,478 coyotes, 238 gray foxes, 11 red foxes, and a dog using M-44 cyanide bombs. It unintentionally killed 82 gray foxes, 7 raccoons, 1 striped skunk, and one feral swine using this cruel and indiscriminate method. These

devices also pose unacceptable risks to human and companion animal health in the state. In 2017, an applicator accidentally triggered a device in Leakey, Texas. The individual attempting to place the device experienced burning sensations, a watery eye and blurred vision, and ultimately went to the emergency room.

37.     Wildlife Services also uses leg-hold traps, which are internationally recognized as inhumane and have been banned in many countries. Upon being trapped, animals frantically struggle to free themselves both by attempting to pull their trapped limb out of the device and by chewing at the trap itself or even their own limb. The force of the jaws clamping on the animal's limb and the subsequent struggle can result in severe trauma, including mangling of the limb, fractures, damage to muscles and tendons, lacerations, injury to the face and mouth, broken teeth, loss of circulation, frostbite, and amputation.

38.     In Texas' Fort Stockton, Uvalde, and Corpus Christi Districts, environmental assessments prepared in 2014 and 2016 authorize Wildlife Services to use foothold traps, cage traps, body-grip traps (including Conibear traps and other snap traps), snares, shooting, aerial gunning (shooting animals from airplanes or helicopters), hunting dogs, denning (using poisonous gas to kill animals in dens or excavating pups from dens and then shooting them), indiscriminate chemical methods including M-44s and Livestock Protection Collars ("sodium fluoroacetate"), and more. Many of these methods are nonselective, inherently inhumane, and dangerous.

39.     Target species include mountain lions, coyotes, several species of skunks, gray and red foxes, bobcats, Virginia opossums, and raccoons, as well as free roaming dogs and cats. Wildlife Services has also unintentionally trapped and sometimes killed several non-target animals in Texas' Fort Stockton, Uvalde, and Corpus Christi Districts, including badgers, dogs, cats, rabbits, armadillos, javelina, deer, foxes, muskrats, opossums, porcupines, raccoons, and skunks.

## II.    Mountain Lions and Black Bears in Texas

40.    Texas is home to mountain lions (*Puma concolor*) – also commonly referred to as puma or cougar – large, slender cats with short, muscular limbs and a long tail about one third of the animal's total length. They have black fur on the backs of their rounded ears, on the tip of their tail, and outlining their muzzle. Their eyes are a grayish brown to golden color, and the nose is pink with a black outline.



*Mountain Lion. Photo taken by Dennis Sweetman, courtesy of the National Park Service.*

41.    Evidence suggests mountain lions were once ubiquitous in Texas. Today, however, there are only two distinct resident mountain lion populations in Texas – one west of the Pecos River and another in South Texas, which encompass the Fort Stockton, Uvalde, and Corpus Christi Districts. The West Texas population has been considered stable, likely due to immigration of cats from Mexico and New Mexico. However, evidence suggests the southern resident population is suffering from isolation and low genetic diversity and is at immediate risk of extinction. Further,

studies suggest a trend of mountain lion population decline in the state and indicate that human-caused mortality rates in Texas are among the highest in the country.

42.    Mountain lions are listed as S3 under the Texas Species of Greatest Conservation Need, a list maintained as part of the Texas Conservation Action Plan. S3 is a Vulnerable classification, defined as "[v]ulnerable in the nation or state/province due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, other factors making it vulnerable to extirpation."

43.    Nevertheless, in Texas, mountain lions can be killed at any time, without bag limits or harvest reporting requirements. Indeed, Wildlife Services killed an average of ~17 lions per year in Texas between FY 2020 and 2023 using a host of cruel methods, including shooting, foothold traps, neck snares, and aerial gunning from helicopters.

44.    Black bears (*Ursus americanus*) once roamed in forty-nine of the fifty states in the U.S. In Texas, they ranged across the Trans-Pecos region until the 1950s, by which time they had been nearly extirpated following decades of hunting, trapping and habitat destruction. Since then, black bears have begun to repopulate West Texas from Mexico.



*Mexican black bear at Big Bend National Park. Photo courtesy of the National Park Service.*

45.     Two subspecies of black bear currently reside in Texas' Forst Stockton, Uvalde, and Corpus Christi Districts: the Mexican Black Bear (*Ursus americanus eremicus*) and the New Mexico Black Bear (*subspecies U. a. amblyceps*). Additionally, previously federally-listed Louisiana black bears (*Ursus americanus luteolus*) have begun to reappear in portions of East Texas after their populations were devastated by rampant killing and habitat loss throughout the 19th and 20th centuries. According to data from the Texas Parks & Wildlife Department ("TPWD"), Texas' Fort Stockton and Uvalde Districts currently contain the only breeding populations of black bears in the state.

46.     Black bears are listed as threatened in the state of Texas, and it is illegal to kill, harm, or harass them. Exact numbers are not known. Estimates range between 75–250 individuals. Most of the state's black bears live in the Trans-Pecos region in West Texas.

47.     Since environmental assessments were prepared for Texas' Fort Stockton, Uvalde, and Corpus Christi districts, there has been significant construction of a border wall that will impact mountain lion and black bear populations in Texas. Mountain lion and black bear populations in West Texas rely heavily on individuals crossing the border from Mexico. Border walls can, *inter alia*, limit essential movement of wildlife, making it more difficult for individuals to find mates and other resources. They can also lead to direct mortality, disrupt ecosystems, increase human activity in affected areas, and fragment habitats. U.S. Customs and Border Protection also aims to add twenty-five miles of new flood stadium lighting in West and South Texas, which can interfere with mountain lion hunting and movement (Barrientos et al. 2023).

III.    **NEPA Analysis of Predator Damage Management in Texas**

48.     Wildlife Services has never prepared an EIS to analyze the impacts of its Predator Damage Management programs in Texas.

49.     In 1994, Wildlife Services prepared (and, in 1997, amended) a Programmatic EIS to analyze its nationwide Wildlife Damage Management program. That outdated document relies primarily on science from the 1980s, with some studies dating as far back as the 1930s.

50.     In November of 2014, Wildlife Services, in cooperation with Texas A&M Agrilife Extension Service of the Texas A&M University System ("Texas A&M"), issued an environmental assessment for Predator Damage Management in the Fort Stockton District of Texas. On January 27, 2015, Wildlife Services issued its Decision and Finding of No Significant Impact for Predator Damage Management in the Fort Stockton District.

51.     In November of 2014, Wildlife Services, in cooperation with Texas A&M, also issued an environmental assessment for Predator Damage Management in the Uvalde District of Texas. On January 27, 2015, Wildlife Services issued its Decision and Finding of No Significant Impact for Predator Damage Management in the Uvalde District.

52.     In January of 2016, Wildlife Services, in cooperation with Texas A&M, issued an environmental assessment for Predator Damage Management in the Corpus Christi District of Texas. On April 15, 2016, Wildlife Services issued its Decision and Finding of No Significant Impact for Predator Damage Management in the Corpus Christi District.

53.     On December 2, 2024, Plaintiff sent Wildlife Services a letter providing new scientific and other information relevant to the Predator Damage Management programs in Texas. The letter requested that Wildlife Services supplement its outdated environmental assessments or begin preparation of an EIS given the potential for significant impacts. On January 8, 2025, USDA APHIS acknowledged receipt of Plaintiff's letter but did not commit to taking any action in response.

54.    As of the date of this complaint, Wildlife Services has not supplemented its analyses in the environmental assessments.

## IV.    New Information and Circumstances Affecting Predator Damage Management in Texas

55.    Since Wildlife Services prepared its 2014 and 2016 environmental assessments for Texas' Fort Stockton, Uvalde, and Corpus Christi Districts, new information and circumstances necessitate supplemental NEPA analyses.

56.    Since the issuance of the environmental assessments, several studies have been published that demonstrate the harmful ecological effects of removing predators from ecosystems (Beschta & Ripple 2016; Bergstrom 2017; Ripple et al. 2024).

57.    Studies published after release of the environmental assessments call into question Wildlife Services' assumption that killing predators effectively protects commercial livestock in the long term. For example, Treves et al. (2016) found little or no scientific support for the proposition that killing predators such as wolves, mountain lions, and bears reduces livestock losses (*see also* van Eeden et al. 2018).

58.    Additionally, in the eight to ten years since environmental assessments for Texas' Fort Stockton, Uvalde, and Corpus Christi Districts were issued, numerous studies have been published on, *inter alia*, mountain lion populations, movement, diet and predation patterns, ecological significance, and public attitudes towards mountain lions in the state. These new studies must be considered by Wildlife Services in connection with its ongoing killing of predators, including mountain lions, in these districts.

59.    For example, recent studies have expressed concerns regarding low mountain lion population density in Texas, and even population decline, and note that mountain lions in western Texas "exhibit low annual survival due to high rates of predator control" (Veals Dutt et al. 2023;

*see also* Elbroch & Harveson 2022). Further, studies published after 2016 suggest that anthropogenic mortality rates of mountain lions in Texas are "well beyond the suggested harvest rates recommended to maintain stable mountain lion populations." (Elbroch & Harveson 2022; *see also* Logan & Runge 2021).

60.    TPWD collects data on mountain lion sightings in the state to help estimate populations. According to this data, sightings have declined by more than fifty percent since 2016.

61.    Some of the most recent research on mountain lion movement, habitat use, diet, survival rates, and mortality factors was undertaken by the Borderlands Research Institute in West Texas between the years 2011–2018 (Karelus et al. 2021; Veals Dutt et al. 2023). Among other things, that research found that the annual survival for twenty-one subadult and adult GPS-collared mountain lions in the Davis Mountains – located in the Fort Stockton District – was only fifty-five percent, which is among the lowest reported in the U.S., with almost all mortality due to trapping (Harveson et al. 2016). The low survival rates and high human-caused mortality rates outlined in these studies suggest that the Davis Mountains region was acting as a population sink (meaning the death rate is higher than the birth rate, leading to a decline in population size) due to trapping on private ranches.

62.    Recent studies have also highlighted the ecological importance of mountain lions, explaining that they increase biological diversity and ecological resilience and health (Elbroch et al. 2017; Barry et al. 2018; Strangl et al. 2021; LaBarge et al. 2022; Elbroch & Harveson 2022). Others document public attitudes favoring protections for mountain lions to ensure their continued existence in Texas (Ghasemi et al. 2022; Ohrens et al. 2023).

63.    A 2023 study of mountain lions in the Davis Mountains concluded that "[t]here is no evidence to suggest that predation on non-native prey in the Davis Mountains is supporting

high mountain lion densities" (Veals Dutt et al. 2023). Importantly, in that study, livestock (e.g., domestic cattle and horses) were in the study area yet were never preyed upon. It referenced other studies concluding that "livestock made up very little of mountain lion diet or was not present in the diet at all despite high abundance on the landscape," (Veals Dutt et al. 2023 [citing Ackerman et al. 1984; Thompson et al. 2009; Guerisoli et al. 2021]), and that predation on livestock depends on a number of factors, including – importantly – local ranching practices, (Veals Dutt et al. 2023 [citing Hornocker & Negri 2009; Wilkinson et al. 2020]).

64.    New information also raises concerns regarding threats from Wildlife Services' predator killing activities on state-protected black bears.

65.    In November 2022, TPWD developed a Texas Black Bear Management Plan ("Black Bear Plan"). According to the Plan, "[b]etween 2010 and 2021, there were 7 documented incidents where a bear was caught in a trap set for mountain lions in West Texas, four of which resulted in mortality of the bear (three found dead and one was euthanized due to injuries)." In order to reduce incidental take of black bears, the Black Bear Plan sets forth a strategy to "[w]ork with USDA APHIS Wildlife Services and others to create best practices for mountain lion trappers in black bear habitat" and "[r]ecommend bear-friendly trap-check regulations to minimize the mortality of bears that are inadvertently caught in mountain lion traps."

66.    Black bears in Texas may also be harmed by Wildlife Services' use of dangerous, inhumane, and indiscriminate M-44 cyanide bombs. According to Wildlife Services' data from 2017, nearly fifty percent of M-44 use nationwide occurs in Texas.

67.    In 2019, the U.S. Environmental Protection Agency ("EPA") registered M-44 sodium cyanide capsules for restricted use under the Federal Insecticide, Fungicide, and Rodenticide Act. Specifically, sodium cyanide is used in M-44 ejector devices to kill predators

such as coyotes, red foxes, gray foxes, and wild dogs suspected of preying on livestock. These indiscriminate methods pose a significant threat to non-target wildlife and have killed, *inter alia*, companion dogs, wolves, and black bears. A 2018 review of the Incident Data System maintained by the Agency's Office of Pesticide Programs indicated 114 reported ecological incidents associated with the use of M-44 cyanide capsules from 1978 to 2017. It notes that these devices killed relatively large mammals, including black bears. Accordingly, Wildlife Services' environmental analyses in areas that use M-44 cyanide bombs where state-threatened black bears are present should assess risks to bears from the use of these dangerous, indiscriminate devices.

68.     Finally, new information and efforts on planned construction of a border wall across southern Texas will impact mountain lion and black bear populations in the state. On January 25, 2017, President Trump issued an executive order calling for construction of a wall along the entirety of the nearly 2,000-mile border between the United States and Mexico. After taking office, former President Biden ordered a pause on border wall construction, but later moved forward with construction for certain areas where Congress had already appropriated funds. In 2021, Texas governor Greg Abbott announced that Texas would construct a state-funded wall along the Mexico border. As of October 14, 2024, 46.7 miles of the border wall program had been completed, with a goal to complete 100 miles by the end of 2026. According to the Texas Facilities Commission, construction is underway at thirteen locations in Cameron, Starr, Zapata, Webb, Maverick, and Val Verde Counties, located in Texas' Corpus Christi, and Uvalde Districts.

69.     Studies, including some published after the issuance of the 2014 and 2016 environmental assessments for Texas' Fort Stockton, Uvalde, and Corpus Christi Districts, have shown the negative impacts that border walls have on wildlife, especially large carnivores like mountain lions and black bears (Trouwborst et al. 2016; Peters et al. 2018).

70.    For all the reasons explained above, the environmental analyses are now outdated and can no longer be reasonably relied upon without supplemental NEPA analyses.

## CLAIM FOR RELIEF

**NEPA and APA Violation: Failure to Supplement Environmental Assessments**

71.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs into the claim set forth below.

72.    An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge in order to effectuate the statute's "action-forcing purpose" and allow the agency to act on complete information in undertaking actions that significantly impact the environment. *Marsh*, 490 U.S. at 370–72.

73.    Wildlife Services' Predator Damage Management programs in Texas' Fort Stockton, Uvalde, and Corpus Christi Districts use federal funding to carry out federal programs that kill ecologically significant wildlife, and therefore constitute ongoing major federal actions that may significantly affect the quality of the environment. 42 U.S.C. § 4332(C).

74.    In Texas' Fort Stockton, Uvalde, and Corpus Christi Districts, the environmental analyses are outdated – some more than a decade old – and can no longer be reasonably relied upon without supplemental analysis.

75.    Indeed, significant new circumstances and information that are relevant to environmental concerns and that have bearing on Wildlife Services' activities in these districts have since emerged.

76.    Since environmental assessments were prepared for Texas' Fort Stockton and Uvalde Districts in 2014 and Corpus Christi District in 2016, there have been several new studies on mountain lion populations, movement, diet and predation patterns, and on public attitudes towards mountain lions in the state. These studies present new, critical information on mountain lions that must be analyzed in an assessment of Predator Damage Management activities that authorizes the killing of mountain lions. Data reflects low mountain lion density and population decline. Of particular concern, recent data suggests that anthropogenic mortality rates in Texas are beyond the suggested rates to sustain stable populations and that one of the two breeding mountain lion populations – the southern population – is suffering from immediate risk of extirpation. Considering mountain lions are not managed in the state, meaning they can be killed at any time in any quantities, it is urgent that Wildlife Services consider and analyze this new information in connection with its Predator Damage Management program, which continues to kill mountain lions every year.

77.    Additionally, a recent study of mountain lions in the Davis Mountains (located in the Fort Stockton District) shows livestock made up little to none of their diets, despite high abundance in the study area. That research concluded that predation on livestock depended on, among other things, local ranching practices. This information is critical to Wildlife Services' analysis of its Predator Damage Management activities in the area, as it informs the credibility of supposed threats to certain livestock, such as cattle, by mountain lions, and informs the agency's assessment and recommendations regarding local ranching practices to further prevent the use of harmful, indiscriminate methods of predator control to kill mountain lions.

78.    New information has additionally shed light on threats posed to state-listed black bears from killing of mountain lions that must be analyzed in connection with Wildlife Serves'

Predator Damage Management activities. It shows that black bears have been injured, and even killed, due to being caught in mountain lion traps in Texas.

79.    Additionally, EPA's 2018 M-44 registration review highlights threats to animals and the environment from M-44s, such as threats to black bears who have been killed by these devices. Nevertheless, the environmental assessments for these districts entirely fail to analyze potential impacts to black bears from Wildlife Services' predator killing activities or set forth any analysis of how the agency will prevent incidental take of this state-listed species.

80.    Finally, studies published since 2014 demonstrate the harmful effects of removing predators from ecosystems (Beschta & Ripple 2016; Bergstrom 2017; Ripple et al. 2024) and challenge the efficacy of predator killing and removal for reducing livestock depredation (Wielgus & Peebles 2014; Treves et al. 2016; Eeden et al. 2018).

81.    In light of significant new information regarding threats to mountain lion and state-protected black bear populations in West Texas, and studies regarding the efficacy of predator killing programs, Wildlife Services' failure to supplement its NEPA analyses constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the APA, which has caused or threatens serious prejudice and injury to Plaintiff's rights and interests. 5 U.S.C. § 706.

## **REQUEST FOR RELIEF**

WHEREFORE, the Center requests that the Court:

1.    Declare that Wildlife Services has violated and is violating NEPA, 42 U.S.C. §§ 4321–4347, and implementing regulations, 7 C.F.R. § 372.1–372.10, by failing to supplement the NEPA analyses it has prepared for Texas' Fort Stockton, Uvalde, and Corpus Christi Districts.

2.    Declare that Wildlife Services' failure to comply with NEPA and its failure to halt or limit its ongoing wildlife killing while completing the new analyses constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the APA, 5 U.S.C. § 706(1);

3.    Order Wildlife Services to complete the required NEPA analyses by a date certain;

4.    Enjoin Wildlife Services and its agents from proceeding with implementing the challenged Predator Damage Management programs unless and until supplemental NEPA review is conducted as ordered by the Court;

5.    Award Plaintiffs' their attorneys' fees and costs in this action pursuant to 28 U.S.C. § 2412; and

6.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted and dated this 18th day of February, 2025.

/s/Colin Cox
Colin Cox (TX Bar No. 24101653)
Center for Biological Diversity
1025 ½ Lomas NW
Albuquerque, NM 87102
Phone: (832) 316-0580
ccox@biologicaldiversity.org

Tala DiBenedetto (NY Bar No. 5836994)*
Center for Biological Diversity
P.O. Box 371
Oceanside, NY 11572-0371
Phone: (718) 874-6734, ext. 555
tdibenedetto@biologicaldiversity.org

Andrea Zaccardi (Idaho Bar No. 8818)*
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Phone: (303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs*

*Seeking admission pro hac vice*